Ethel S. White v. Commissioner. R. L. White v. Commissioner.
Ethel S. White v. Commissioner
Docket Nos. 12570, 12571.
United States Tax Court
1947 Tax Ct. Memo LEXIS 89; 6 T.C.M. (CCH) 1038; T.C.M. (RIA) 47262; September 25, 1947
Leroy G. Denman, Esq., 215 Commerce St., San Antonio, Texas, for the petitioners. Stanley B. Anderson, Esq., for the respondent. JOHNSON Memorandum Findings of Fact and Opinion JOHNSON, Judge: The Commissioner determined deficiencies in income taxes of the petitioners for the years 1943 and 1944 as follows: R. L. White for 1943, $890.13, and for 1944, $3,935.97; Ethel S. White for 1943, $957.69, and for 1944, $3,935.97. The year 1942 is also involved by reason of the provisions of the Current Tax Payment Act of 1943. Petitioners *90 assail: (1) Commissioner's holding that petitioners' share of the profits of $23,842.69 realized by the partnership of R. L. White Co. during the taxable year ended December 31, 1944, from the sale of real estate constituted capital gains and not income derived in the ordinary course of a trade or business. (2) The disallowance of two bad debt deductions, one for $11,872.13 due by the Alamo Paving Co., and the other of $12,182.99 due by the Southern Paving Co., both claimed for 1942, and the Commissioner failed to allow such deductions in calculating the income for that year in the carry-over into the following years here involved. (3) The failure in calculating the taxable income for 1943 and 1944 to allow the capital loss carry-over from 1942 upon the stock of the Alamo Paving Co. and the Southern Paving Co., amounting to $11,921.34, plus an additional 3/12 of $3,973.78. The proceedings were consolidated and submitted upon oral testimony and documentary evidence. Findings of Fact Petitioners are husband and wife, residents of San Antonio, Texas, and filed separate income tax returns on a community basis for each of the years involved with the collector of internal revenue *91 at Austin, Texas. Since the income here involved was community and the same question obtains as to each petitioner, and petitioner R. L. White having managed all of the business from which the income was received, he will be referred to as petitioner. Petitioner, aged 69 years, is a successful business man, has engaged in various kinds of business, viz: country school teacher, owner of a dairy in Beaumont, Texas, which in 1903 he sold, together with a small part of the land on which it was located, to obtain funds to attend the University of Texas, where he took law and thereafter attempted to practice law for a few years, then reverted to business and became part owner and manager of the Uvalde Rock Asphalt Co., with mines at Uvalde, Texas, which produced material for paving, with which concern he continued successfully and profitably for ten years, then resigned as manager and went into the paving business in San Antonio for himself and was quite successful and did paving on an extensive scale in San Antonio, Dallas and Ft. Worth. About three years after going into the paving business he entered the asphalt mining business again, this time alone, and continued operation of both *92 the mining and paving business. The 1929 depression affected adversely both the mining and the paving business, but the coming of the war caused a revival, especially in the rock asphalt which was needed at army cantonments, roadways, etc., and he has continued most profitably in that business, which he calls White Uvalde Mines. In December 1942 since his son who had been associated with him had gone to the army, and due to his inability to secure competent help, petitioner felt that he could not continue the operation of both the mining and paving business, and dissolved two of his paving companies, the Alamo Paving Co. and the Southern Paving Co., and sustained losses in both. About two years prior to the taxable years involved, petitioner established a lumber business, called Southern Lumber Co., unincorporated and owned by him, but it had become inactive during 1943 and 1944. Some years prior to 1942, petitioner established another branch of his business which he called the R. L. White Co., unincorporated and of which he was the sole owner (except for his wife's community interest), until 1943, when a 3/12 interest in the R. L. White Co. was given to petitioners' children. *93 During all of 1943 and 1944 petitioners owned 9/12 of the R. L. White Co., a partnership, and their three children owned the remaining 3/12. In the income tax returns of R. L. White Co. for both 1943 and 1944 the "business or profession" of said company appears to be "real estate, ranching and investments," which returns for both years were signed by petitioner R. L. White for the firm. The profits from the sale of the real estate here involved were made by R. L. White Co., and on the partnership return for the year 1944 capital gains were reported as follows: CAPITAL GAINS
$ 5,721.56
Real Estate Notes
Profit on Installment Collections
$11,443.11
Less 50% - (Capital Assets)
5,721.55
REAL ESTATE CONTRACTS
5,418.54
Profit on Installment Collections
$10,837.09
Less 50% - (Capital Assets)
5,418.55
REAL ESTATE (Cash Sales)
781.25
Sales
$ 2,948.08
Less Cost of Sales
1,385.59
Profit
$ 1,562.49
Less 50% - (Capital Assets)
$ 781.24
Total
$11,921.35
In the notice of deficiency the Commissioner held that the profits shown above represented income derived in the ordinary course of a trade or business and not capital gains, as reported by *94 the partnership, and added the three 50 percent capital assets items deducted above, whereby the net profits aggregated $23,842.69, as determined by the Commissioner. Petitioner made loans with land as security and acquired by purchase considerable real estate, holding some of it as an investment, among which were ranches in two southwest Texas counties of over 10,000 acres each, and a building on a main business street in San Antonio. He also owned much San Antonio real estate most of which he acquired in foreclosure of paving liens in connection with his paving business, the major portion of which was the B. G. Irish property, consisting of about a dozen different subdivisions which had been subdivided and paved by Irish, a very large operator who failed about 1930 owing petitioner over $300,000 secured by paving liens, and Irish owed also about $600,000 covered by prior liens and petitioner, in order to protect his liens, borrowed money and paid these prior liens and became owner of all these properties. The continuance of the 1929 depression for a number of years prevented petitioner from selling these lots, and finally, by profits from his other busines, he was able to pay *95 off and own them free of debt. He spent no money improving the Irish property except through his lumber company (Southern Lumber Co.) he built 25 to 50 houses, some of which he built for certain parties, and some for sale generally. In 1942 petitioner made cash sales of real estate of over 250 lots, covered by 47 different transactions aggregating $203,484.30 (all being Irish properties except $20,000 from sale of Beaumont, Texas, lots acquired in 1899); in 1943, 87 lots covered by 6 different transactions aggregating $48,011.45 (all Irish properties), and in 1944, 3 lots covered by three different transactions aggregating $2,948.08 (two Irish and one paving lien properties); in addition to cash sales in these years there were also installment sales and profits from sales made in previous years. The record does not reveal the number of installment sales made, but it does show that the total profits collected from installment sales in 1942, 1943 and 1944, including profits on previous installment sales made, aggregated $51,056.82, and that in 1944 the total profits collected from installment sales, including those made in previous years, were $22,242.50, and the profits in 1944 from *96 new installment sales alone were $5,181.36. R. L. White Co. paid the State of Texas for a real estate broker's license fee. The principal business of a majority of those belonging to the San Antonio Real Estate Board was other than real estate. Petitioner had no employee whose sole duty was to make real estate sales. He had no fixed prices on his real estate and offers to buy and information concerning sales were transmitted though his office manager who had charge of collections, etc. Several times he refused to make sales or fix a price where real estate dealers desired to purchase lots in quantities of 50 to 100; he preferred retail sales, preferably on the installment plan, and would only sell when a high price could be obtained, and made no sales on commission. The Alamo Paving Co. was incorporated on August 13, 1923, and the Southern Paving Co. on December 29, 1929, and petitioner was the controlling stockholder in both. Petitioners under their firm name of R. L. White Co., at different times and in different amounts during 1930 to 1942, made advances in money, upon open account to both of these corporations, and during said period withdrew and received payments, some *97 times in substantial amounts from these paving corporations. Petitioners' exhibit 1 shows the state of the account during this period with the Alamo Paving Co., and exhibit 2 with the Southern Paving Co., both of which are adopted as part of our findings of fact. In 1933, due to the depression, paving activities throughout the country ceased and both corporations became inactive and dormant and remained so until they were liquidated in December 1942; during this time their receipts were negligible and their expenses included no salaries except payment of watchmen and were limited to incidental expenses in conservation of their properties. R. L. White Co. was their only creditor during this period. It was the intention of both corporations to resume operations when business conditions warranted, but in December 1942, petitioner's only son who had been associated with him in business had gone to war, and he was unable to secure competent help to operate his paving business and due to his age he decided to devote all of his time to his mining business and liquidate these paving companies. At the time of their liquidation, Alamo Paving Company's indebtedness to petitioners was $17,872.13, *98 and same was credited with $6,000, value of real and personal property bought by petitioners from Alamo Paving Co., leaving a net loss of $11,872.13, which amount was charged off on petitioners' books as a bad debt. Southern Paving Company's indebtedness to petitioners at time of liquidation was $18,902.99, which was credited with $6,720, value of real and personal property acquired by petitioners in the liquidation, leaving a loss of $12,182.99, which was charged off as a bad debt on petitioners' books. These advances made by petitioners to both of these paving corporations constituted debts which became worthless in 1942. Opinion Issue No. 1. Was the net income of petitioners derived through R. L. White Co. from the sale of real estate during the taxable year ended December 31, 1944, taxable as ordinary gain as determined by respondent, or was it a capital gain as claimed by petitioners? Capital gains and losses are prescribed and defined in section 117, Internal Revenue Code. Section 117 (a)[1] defines "capital assets," and that portion of this dennition upon which respondent here bases his determination that such net income was not capital gains is *99 contained in the clause "capital assets * * * does not include * * * property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." Respondent also cites section 29.117-1, Regulations 111, [2] as interpretative of this subsection of the Code, and particularly as applied to sales of land by a dealer in real estate. *100 Petitioners in their brief argue that the evidence shows that they were not holding the property, the profits from the sales of which constitute the basis of this controversy, for sale to customers in the ordinary course of trade or business, but were holding same as an investment; and in support of this contention cite these circumstances: (1) That they had acquired and retained ownership of the property for many years prior to its sale. At one time the Code defined as "capital assets" property owned or held more than two years prior to its sale. Such was the law when George H. Peck, 19 B.T.A. 345, cited by petitioners, was decided. However, under existing law the time element of ownership has been eliminated from the statutory definition, and as stated in the regulation quoted, the period for which the property has been held is immaterial. In the present case one explanation for the long holding of the property appears from the evidence to have been due to the fact that much of it was acquired in the early days of the 1929 depression which lasted for many years, during which time there was no demand for or sales of real property. (2) That most of the property involved *101 was not purchased by petitioners, but they were forced to acquire it to protect their liens and collect what was due them for work done in their paving business. It has been held that the manner or the reason for the original acquisition of the property is not determinative of the issue here involved. Richards v. Commissioner, 81 Fed. (2d) 369. As was said in Richards v. Commissioner, supra, the question is, after its acquisition, was it held for sale to customers in the ordinary course of a trade or business? (3) That petitioner gave little, if any, personal attention to the sale of the lots. He was engrossed with his other business and the sales made resulted from offers and negotiations transmitted to him through his office, which the public understood was the medium through which sales were effected. It is elementary that one may conduct business through others as agents or employees, Ehrman et al. v. Commissioner, 120 Fed. (2d) 607, and in Richards v. Commissioner, supra, the taxpayer took no part whatever in the sale of the lots but all of same was handled by his trustee, and yet he was held to have been engaged in the business *102 of selling real estate, although not licensed as a broker so to do. In the pending case the fact that petitioner had other business, and certainly the sale of real estate was not his principal business, would not preclude him from being also engaged in "the business" of selling lots within the meaning of the statute. It need not have been his sole occupation. Snell v. Commissioner (C.C.A., 5th Cir. 1938) 97 Fed. (2d) 891. We agree with the statement contained in petitioners' brief that "the true test" determinative of the issue here involved "is whether the petitioners went into the lot selling business," but we cannot subscribe to the negative conclusion there reached; on the contrary we think the evidence shows that petitioners did go into such business. In the opinion in Ehrman v. Commissioner, supra, there is cited with approval a quotation from Commissioner v. Boeing, 106 Fed. (2d) 305, which reads: "* * * From the cases it would appear that the facts necessary to create the status of one engaged in a 'trade or business' revolve largely around the frequency or continuity of the transactions claimed to result in a 'business' status. *103 * * *" Measured by this test we think the evidence sufficient to establish petitioners' status as being engaged in the real estate or lot selling business. In 1944, the year involving this issue, petitioners sold 28 lots, 3 for cash and 25 on the installment plan, and during the three years 1942, 1943 and 1944, all of which are here under review, petitioners sold a total of 267 lots, 185 for cash and 82 on the installment plan; the total consideration received from real estate sales in the three years by petitioners from the cash sales alone being $254,443.87. There should be added to this sum the consideration received, or to be received, from the installment sales during these three years, but this is not available from the record. However, exhibit 4 does show the profits collected from installment sales during 1942, 1943 and 1944, and in 1944 the profits collected from new installment sales alone totaled $5,181.36, and the entire profits collected for that year from installment sales, including those made in previous years, was $22,242.50. The total profits collected from installment sales in 1942, 1943 and 1944, including profits on previous installment sales made, aggregate *104 $51,056.82. The number of lots sold, the consideration received, and the profits realized, reveal that the sales were not casual, but rather indicate a frequency, continuity, and a volume, characteristic of one engaged in the real estate business on a rather substantial scale. The figures here are in striking contrast to those in The Kanawha Valley Bank, 4 T.C. 252, cited by petitioners, where a bank prohibited by law from engaging in the real estate business during the two taxable years involved sold only three parcels of real estate. Petitioner testified he made no sales on a commission, and we take it that he was not engaged in selling for others. However, many persons who engage in the real estate business sell only for themselves. That petitioner had no employee whose sole duty was selling real estate would, in the absence of other testimony, be a circumstance that he was not engaged in such business, but this fact, when considered with other evidence, and in the light of the entire record, relates rather to petitioner's manner and method of carrying on his business. Evidently he did not employ the highpressure methods used by some engaged in that business. *105 Different methods are employed by different dealers in conducting a real estate business. Petitioner apparently did not believe in the maxim of "quick sales and small profits," but rather preferred "slow sales and larger profits." In any event his method was successful. That he refused to sell, or even price, a large batch of lots to other dealers on several occasions would indicate that he preferred to make the sales himself and thereby receive a larger profit. Another circumstance indicating that petitioners were engaged in the real estate business is that R. L. White Co. paid the State of Texas for a real estate broker's license fee. Petitioners sought to break the effect of this testimony by showing that 25 percent of those belonging to the Real Estate Board of San Antonio were not engaged exclusively in the real estate business. We think the holding of this license from the state to transact a real estate business has probative force. But the highest and best evidence that petitioners, and especially their firm of R. L. White Co., was engaged in the real estate business in 1943 and 1944 (1944 here involved) is the statement made by petitioner, R. L. White, himself to that *106 effect. In the income tax returns for those years which he made for the R. L. White Co. he stated as the business or profession of the company "real estate, ranching and investments." Real estate was listed as the first business of the firm. Surely petitioner, R. L. White, who both managed and owned this business and was an experienced and astute business man with a legal education, knew in what business his firm was engaged. We hold that the property in question was held by petitioners primarily for sale to customers in the ordinary course of their trade or business, and that gains therefrom are ordinary, and not capital gains. Issue No. 2. Petitioners, on their income tax returns for 1942, claimed two bad debt deductions, one of $11,872.13 due them by the Alamo Paving Company, and the other of $12,182.99 due by Southern Paving Company, both of which were disallowed by the Commissioner on the ground that these debts did not become worthless in 1942. Additional grounds upon which respondent's counsel sought to justify disallowance of these alleged bad debt deductions were these: On the hearing (1) he asserted that the amounts petitioners advanced to the two corporations were *107 contributions or donations made by petitioners with no expectation of their being repaid, and in his brief (2) that such advances were contributions to capital, and not bad debts within the meaning of the Code, and (3) that the record does not disclose the assets acquired by petitioners from the corporations at the time of their liquidation, nor the values of such assets received, and hence the amount or net loss of the debts is not ascertainable. None of these contentions of the respondent are sustained by the record. Respondent's brief indicates his nonreliance upon the ground stated in the Commissioner's determination that these debts "did not become worthless in 1942." Obviously, until the liquidation of the two debtor paving corporations which occurred in 1942, it could not be known the amount of petitioners' loss if any. The dormancy or inactivity of the two paving corporations for some years prior to their liquidation, and the fact that each had a deficit in those years does not establish the worthlessness of the claims. There was always the potential expectation that when the years of depression passed, the demand for paving would return and activity would be resumed on a *108 profitable basis as theretofore. Petitioners' other business, the rock asphalt mining, had, like the paving business, been adversely affected by the depression and had been suspended for some years, but when the demand for this material returned, petitioner had resumed its operation very profitably, and the evidence indicates that he might have been able to do the same with the paving business, had he been prepared to operate it. Petitioner's only son, who had been associated with him in business, had gone to war, and due to the difficulty in securing competent assistance and petitioner's advancing years, he was unable to operate both the mining and the paving business and he decided in 1942 to liquidate the latter. The only evidence tending to support respondent's contention that these advances were "donations" and not loans is an entry reading, "Donated. See new sheet" on the books of the Southern Paving Company in the handwriting of a former bookkeeper, now deceased. This entry appears to have been made in July, 1934, in reference to the balance of the account which Southern Paving Company then owed petitioner, of $21,628.37, but on the new sheet the account, instead of being *109 cancelled, on the same date is transferred and the item is still carried as a liability, which refutes the accuracy of the entry that such sum was donated. There was no like entry on the books of the Alamo Paving Company. Petitioner testified that he did not know why the entry was made, that it was not authorized, and he knew nothing of its existence until his attention was called thereto a few days before the hearing in this case. That sums advanced by petitioner to the paving corporations were regarded by all parties concerned as debts and not donations is established by the books of the petitioner as well as the books of the two paving corporations, and also by the corporate income tax returns of the Alamo Paving Company and Southern Paving Company from 1930 to 1942 in evidence, which show for each year under "accounts payable" a liability identical in amount as that shown by the books due by the paving companies to petitioner. Respondent insists that because petitioner was the principal stockholder in the paving corporations and that these corporations were for some years prior to their liquidation dormant and inactive, that petitioner's advances to them were contributions *110 to capital and not deductible as bad debts. We agree that contributions to capital cannot be deducted as debts ascertainable to be worthless. American Cigar Co. v. Commissioner, 66 Fed. (2d) 425. Under the evidence in the pending case, however, the advances by petitioners to the paving corporations were not contributions to capital. They were loans to, and not investments in, these corporations. The advances to both corporations consisted of cash for different amounts made over a period of years (1929 to 1942) and the indebtedness is evidenced in both instances by an open running account between petitioners' firm, R. L. White Co., and the two paving corporations. The trial balances reveal that the accounts fluctuated in amounts each year, and it appears that at times R. L. White Co. would receive funds from the paving corporations, and for the year 1929, instead of the Alamo Paving Company being indebted to the R. L. White Co., the R. L. White Co. was indebted to the Alamo Paving Company for over $50,000. Until the depression both paving corporations were making money, and they continued in operation and making some money until the year 1933, when the effect of the *111 depression had stopped paving everywhere and both corporations became dormant and remained so until they were liquidated. The income tax returns of both paving corporations show that in 1933 and thereafter the receipts of the corporations were negligible and expenditures reduced to a minimum; no salaries appear to have been paid to any one except to watchmen, and the expenses consisted of taxes, insurance, gas, lights, water and other incidental expenses necessary in the conservation of their properties. The income tax returns indicate that R. L. White Co. was the sole creditor of the corporations. At the time the Alamo Paving Company became inactive in 1933, it owed petitioners $11,654.89, and in 1942, just before the liquidation, this indebtedness had been increased to $17,872.13. The Southern Paving Company's indebtedness to petitioners in 1933, when its inactivity began, was $10,404, and just prior to the liquidation in 1942, it had grown to $18,902.99. Respondent in his brief, in arguing this question, says: "If the corporations had been actively engaged in business and petitioner had advanced sums for the purpose of aiding the business operations, it is conceded that such *112 advances could be construed as loans made with the expectation of repayment." The major portion of the sums advanced by petitioner to both of the paving corporations was made while they were actively engaged in business, and evidently for aiding their business operations, and such amounts are therefore deductible under respondent's own concession. However, as to the balance - that is, the increase in the accounts after dormancy began, we think it also deductible. We fail to discern any difference in principle between advancing sums for business operations while a company is actively operated and sums advanced for incidental expenses for conservation of property while the business is temporarily dormant awaiting the return of business conditions which would justify activity again. Joseph B. Thomas, 2 T.C. 193, relied upon by respondent, is distinguishable, the facts being wholly dissimilar. There the taxpayer had contracted with the owner of a patent that he would furnish the finances to develop, manufacture and distribute the product, and that an operating corporation would be organized, each to own one half of the stock. His partner testified that the taxpayer's *113 advances were not a loan and we held them to be contributions to the capital of the corporation, the evidence showing that they were the only amounts contributed to the capital, and without which the corporation would have been operating without any paid-up capital in definance of New Jersey law. Here the paving corporations were organized and their capital stock paid up before the advances in question were made. We held in Daniel Gimbel, 36 B.T.A. 539, that payment by a shareholder to his corporation "was not per se a contribution by him to its capital, which augments the cost of his shares," and that the circumstances under which the payment is made is controlling. The opinion further states that "if there is intent that the payment shall enlarge the stock investment, the shareholder may not for tax purposes treat it otherwise to support a loss or bad debt deduction. Whether there is such intent, actual or to be implied, is determinable upon evidence which may vary in different cases." The evidence in the pending case reveals no intention, either actual or implied, that the advances were made to enlarge petitioners' investment in the stock of the corporation, but *114 were loans' or advances made on open account in the operation of the business. Petitioners' claim for loss on capital contribution, wholly different from this, is asserted under Issue No. 3. Despite respondent's contention, the net loss is ascertainable from the record. Petitioners' exhibit 1 discloses the assets acquired by petitioners from the Alamo Paving Co. at the time of its liquidation were: personal property therein enumerated "sold R. L. White Co. for $2,000" and real estate therein enumerated "sold R. L. White Co. for $4,000," which sum of $6,000 was deducted from the $17,872.13 then due by the Alamo Paving Co. to petitioners, leaving $11,872.13, the amount of that bad debt deduction claimed by petitioners. And petitioners' exhibit 2 discloses the assets acquired by petitioners from Southern Paving Co. at the time of its liquidation were: personal property enumerated "sold R. L. White Co. for $4,220" and real estate therein enumerated "sold R. L. White Co. for $2,500," making a total of $6,270, which was deducted from $18,902.99 then due by Southern Paving Co. to petitioners, leaving a balance of $12,182.99, bad debt deduction of Southern Paving Co. as claimed by petitioners. *115 We hold that petitioners are entitled to deduct both of these sums as bad debt deductions as claimed by them. Issue No. 3. Petitioners' claim that on their stock loss in the Alamo Paving Co. and Southern Paving Co. they were entitled to apply a long term capital loss carry over in the amount of $11,921.33 and other amounts from the year 1942 in calculating and determining their taxable net income for the year 1944 was disallowed by the Commissioner, among other reasons on the ground that petitioners had no long term capital gains in 1944 against which the carry over loss could be applied. We sustain this holding of the Commissioner. Petitioners' contention that they had capital gains in 1944 was based alone upon their claim that the profits from the sale of real estate were capital gains which we have decided adversely to their contention in Issue No. 1. Decisions will be entered under Rule 50. Footnotes
1. SEC. 117. CAPITAL GAINS AND LOSSES. (a) Definitions. - As used in this chapter - (1) Capital Assets. - The term "capital assets" means property held by the taxpayer (whether or not connected with his trade or business), but does not include stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, * * *. [Italics supplied.] ↩
2. REGULATIONS 111: Sec. 29.117-1. MEANING OF TERMS. - The term "capital assets" includes all classes of property not specifically excluded by section 117 (a) (1). In determining whether property is a "capital asset," the period for which held is immaterial. * * * However, gain or loss upon the sale or exchange of land held by a taxpayer primarily for sale to customers in the ordinary course of his business, as in the case of a dealer in real estate, is not subject to the limitations of section 117 (b), (c) and (d). The term "ordinary net income" as used in these regulations for the purpose of section 117↩ means net income exclusive of gains and losses from the sale or exchange of capital assets.